**NAGER ELECTRIC COMPANY, Inc. and Keystone Engineering Corporation**

v.

**The UNITED STATES.**

No. 348–64.

United States Court of Claims.

June 14, 1968.

Albert Foreman, New York City, attorney of record, for plaintiff, Edwin Efros and M. Carl Levine, Morgulas & Foreman, New York City, of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

DAVIS, Judge.

At an earlier stage of this controversy we rejected the Government's assertion, on its then motion for summary judgment, that plaintiffs' first cause of action (based on an allegedly improper termination-for-default) should be dismissed as barred by the statute of limitations, but specifically reserved the Government's alternative ground that the claim is one arising "under the contract" and the plaintiffs failed to exhaust their administrative remedies. We also withheld decision on plaintiffs' contention that, even if the cause of action is not one for breach of contract, defendant is estopped from so claiming by the conduct of its representative at the administrative level. Nager Elec. Co. v. United States, 368 F.2d 847, 866, 177 Ct.Cl. 234, 263 (1966).

The defendant has now renewed its exhaustion defense as the basis for summary judgment on plaintiffs' first cause of action, and plaintiffs have countered with the estoppel point. The necessary documents are all before us. We hold that the termination claim did arise "under the contract", that plaintiffs adequately pursued their administrative remedy, that defendant is estopped from claiming that the issue must be determined, if at all, by an administrative tribunal, and, therefore, that plaintiffs may have a trial in this court on the cause of action.

The background facts pertinent to the present motion are simple enough. Plaintiffs contracted with the Atomic Energy Commission to build "second phase" facilities at an AEC laboratory in the State of New York. In July and August 1958, the project manager (or contracting officer), relying on the contract's "termination-for-default" article, canceled twenty-five of the items in plaintiffs' contract and later deducted about $18,000 from payments to the contractors as the cost of acquiring substitute performance of the terminated work. Plaintiffs seek recovery of that amount.[1]

The first question is whether the claim is one "arising under the contract" or whether it "falls outside the scope of the 'disputes' clause" because it "relates to matters which cannot be handled under one or more of the standard adjustment clauses"—in this case the "termination" clauses. Schlesinger v. United States, 383 F.2d 1004, 1007, 181 Ct.Cl. 1004 (1967). We think that the wording of the default clause, as well as the practice of this court and of the boards of contract appeals, make it very clear that this dispute—which centers on the plaintiffs' claim that their default was justified by Government interference—is subject to administrative resolution.[2] In the absence of a waiver by the parties of the administrative processes, we have always treated such fac-

1. If the plaintiffs' default is found to be excusable, and on that ground the default-termination converted (under its terms) into a termination for the convenience of the Government, the contract's "termination" clauses would permit plaintiffs to recover the excess costs assessed less an equitable credit to the Government for the work the plaintiffs did not have to do.

2. Because plaintiffs bottom their case on the assertion that their default was justifiable, we are not concerned with the lack of need for administrative action on a claim that a termination is improper because the contractor was not in default *at all.* See Schlesinger v. United States, 390 F.2d 702, 710 & n. 11, 182 Ct.Cl. —— (1968); Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 722–724 & n. 22

tual questions imbedded in termination-for-default controversies as within the scope of the "disputes" clause,[3] and so have the administrative boards.[4]

The stage is therefore set for the argument that the plaintiffs did not properly prosecute their partial-termination claim before the contracting officer and the Commission's hearing examiner, each of whom held—erroneously—that he had no jurisdiction over the claim. The defendant's argument indicates, however, that it expected too much of plaintiffs, so much so that it wanted the contractors to play the Government's role as well as their own.

A contractor's part in presenting a claim to the contracting officer is to "invite a ruling" by putting him "on notice both as to the relief requested and the contract clause on which the request [is] based." Acme Proc. Equip. Co. v. United States, 347 F.2d 509, 534, 171 Ct.Cl. 324, 366, (1965), reversed on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Conversely, "ambiguous requests for adjustments or possible negotiations regarding adjustments as distinguished from demands predicated upon an expressed contractual right" may result in dismissal of the suit for failure to exhaust administrative remedies. Specialty Assembling & Packing Co. v. United States, 298 F.2d 794, 796, 156 Ct.Cl. 252, 255 (1962). The plaintiffs have fulfilled the minimum role defined in those cases.

The contracting officer was well aware that plaintiffs considered the termination and assessment of completion costs an improper application of the "termination-for-default" article and that they wanted him to decide all factual issues under the "disputes" clause. In a September 1958 letter to the AEC manager, counsel for plaintiffs stated the "desire to exhaust all administrative remedies and have a final determination by the contracting officer and the Commission, as provided under the Disputes Article of the Contract, so that we may proceed from that point without any contention being made against us that we failed to exhaust our administrative remedies." In a subsequent letter to the Commission's chief counsel (at the Sche-

(1964); Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961).

3. See Stoeckert v. United States, 391 F.2d 639, 183 Ct.Cl. —— (March 1968); Schlesinger v. United States, 390 F.2d 702, 182 Ct.Cl. —— (1968); Franklin Co. v. United States, 381 F.2d 416, 420–421, 180 Ct.Cl. 666, 674–675 (1967); Consolidated Airborne Sys., Inc. v. United States, 348 F.2d 941, 943, 172 Ct.Cl. 588, 592–593 (1965); General Porcelain Enameling Co. v. United States, 172 Ct.Cl. 531, 532, 547 (1965); American Marine Upholstery Co. v. United States, 345 F.2d 577, 581, 582, 170 Ct.Cl. 564, 572, 573 (1965); H & H Mfg. Co. v. United States, 168 Ct.Cl. 873, 877, 880–881 (1964); Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 726–728 (1964); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 96 n. 7, 167 Ct.Cl. 604, 608 n. 7 (1964); Lester Bros., Inc. v. United States, 151 Ct.Cl. 536 (1960); Automatic Screw Prods. Co. v. United States, 145 Ct.Cl. 94, 169 F.Supp. 951 (1959); Whitlock Corp. v. United States, 159 F.Supp. 602, 607, 141 Ct.Cl. 758, 764, cert. denied, 358 U.S. 815, 79 S.Ct. 23, 3 L.Ed.2d 58 (1958); Joseph A. Holpuch Co. v. United States, 58 F.Supp. 560, 564–565, 102 Ct.Cl. 795, 803–804 (1945); cf., e. g., Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. —— (Jan. 1968). The issue was apparently not raised in Kennedy v. United States, 164 Ct.Cl. 507 (1964), or Austin Co. v. United States, 314 F.2d 518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963).

4. See, e. g., Argus Indust. Inc., 66–2 B.C.A. ¶ 5711 (ASBCA No. 9960); Omnicraft Corp., 66–1 B.C.A. ¶ 5495 (ASBCA No. 10869), and cases cited; Park Tissue Mills, Inc., 1963 B.C.A. ¶ 3747 (ASBCA Nos. 7569, 7570, & 7904); Monarch Serv. Launders & Cleaners, 1963 B.C.A. ¶ 3714 (ASBCA No. 8105), and cases cited; Denison Research Foundation, 1963 B.C.A. ¶ 3651 (ASBCA No. 7653); Royal Elec. Inc., 1962 B.C.A. ¶ 3571 (ASBCA No. 3340); Photron Instrument Co., 1962 B.C.A. ¶ 3362 (ASBCA No. 7523), and cases cited; Charles Wiggins, 58–1 B.C.A. ¶ 1644, at 6099–102 (ASBCA No. 4613); Facs Prods., Inc., 57–1 B.C.A. ¶ 1215 (ASBCA Nos. 3336 & 3601); Stanley W. Taylor, 57–1 B.C.A. ¶ 1168 (ASBCA No. 3641).

nectady regional office), to whom the manager had referred the matter, plaintiffs indicated that their primary objection to the termination was "the fact that the General Electric Company, Agent for the Atomic Energy Commission, was interfering with the contractor's performance."

Despite the regional counsel's constant request that the "issues * * * be delineated" further, we think that plaintiffs' correspondence adequately informed the contracting officer of the nature of their claim.[5] Further proof that a precise issue was posed for decision is contained in the acting manager's letter to plaintiffs, summarizing the matters left unsettled after an August 1959 conference in his office. He wrote that "it is not clear that Clause 6 ['disputes'] is applicable to the Government's claim * * * [for] the actual cost * * * for performing that part of the contract work which was not performed by you because of termination action under the provisions of Clause 5 ['termination-for-default']."

The Government emphasizes that the plaintiffs never responded to the acting manager's further statement (in the same letter) that he would "be glad to have an expression of your views * * * in this regard." Plaintiffs explain that they did not read this as a demand for briefing and that they had made their position as clear as need be, thus eliminating the necessity for further correspondence at that point. We agree.

■ After the manager found that "there was [no] dispute concerning a question of fact" with respect to the termination,[6] the contractors appealed to the Commission, contending that "the default order was improper and the amount charged * * * excessive." At the hearing before the AEC examiner, plaintiffs' counsel submitted the termination question as "a factual issue, * * subject to [AEC] review." He added that "to protect our rights for [judicial] review * * * we must follow our administrative remedies and exhaust these administrative remedies" and that, "[if] this Board feels it has no jurisdiction, at least we have taken our appeal and have protected the record."

After questioning plaintiffs' attorney as to the reason why he considered the termination unjustified, the hearing examiner expressed the view that the issue "seems to be beyond the scope of the jurisdiction of this type of proceeding" "since it involves, clearly, a breach." With this plaintiffs' counsel agreed "as an attorney to an attorney" and reiterated that his objective was to avoid a failure-to-exhaust defense in any subsequent judicial suit. The examiner then dismissed the witness plaintiffs had brought to testify on the termination and concluded that the appellate tribunal had no jurisdiction over the matter.[7]

5. As the chief counsel's letter of November 1958 indicates, he kept the manager posted on the progress of the correspondence with plaintiffs, which he was handling on behalf of that officer.

6. He seems to have thought that all the issues bearing on the termination—including interference with plaintiffs' performance and the reasonableness of the excess costs claimed by the Government—were questions of law not subject to decision under the "disputes" article. In this, as we have held, he was plainly mistaken. Such disputes are the grist for the administrative mill. See cases cited in notes 3–4 supra.

7. The defendant attaches undue significance to the examiner's notation in his written decision that the termination claim "was recognized by Nager to constitute a claim for breach of contract, and thus to be beyond the jurisdiction of this forum; therefore, it is not considered herein." In the light of the exchanges at the hearing, it is apparent that the examiner meant that, after losing the point, plaintiffs gave up, perhaps because their counsel did not have much faith in it. But the matter was in fact presented, and counsel's attitude was an acceptable response in the circumstances. The important thing is that the termination issues were brought up on appeal by plaintiffs and that the examiner decided for himself, after hearing argument, that he had no jurisdiction.

The Commission's legal representative, as well as plaintiff's lawyer, explicitly assented to this disposition of the claim.

On the basis of this undisputed evidence, we cannot accept the defendant's contention that plaintiffs have not "pursued" their administrative remedy. The hearing officer was cognizant of the basis for plaintiffs' claim, and the plaintiffs were ready to present their witnesses if the hearing examiner decided he had authority to grant relief. The defendant has cited nothing, including agency regulations, that requires more.[8] What defendant seems to object to is not that plaintiffs failed to present their claim but that they displayed a notable lack of conviction in doing so, especially before the examiner. If, however, the claim is actually presented on appeal, the strength of the claimant's support of it is irrelevant for the purpose of deciding an issue of exhaustion. See note 7 supra.

In any event, the misinformation of the manager and the hearing examiner is as much (and probably more) attributable to defendant as to plaintiffs. The AEC attorney did not stand idly in the wings. Prior to the manager's initial decision he took the stand—adopted by the manager—that "the question of whether the termination was justified * * * involves a determination of the legal rights and obligations of the parties rather than a determination of factual issues." Later, in his opening remarks at the examiner's hearing, he argued that the Commission "is not the proper forum for consideration of that kind of claim" because "it pertains not to a dispute arising in the performance under the contract, which is the kind of

dispute contemplated by the disputes article, but it covers matters arising outside of the contract—work that they [plaintiffs] did not do"; "I, therefore, reiterate the position of the Contracting Officer that with respect to this item, * * * [plaintiffs' counsel] is not before the right [forum]." While he did not join in the colloquy just preceding the examiner's final jurisdictional pronouncement, he did expressly agree with the disposition of the termination dispute.

In these circumstances, it is plain that the plaintiffs cannot be convicted of having failed to seek and pursue administrative relief, and that the defendant's motion for summary judgment on that ground must be denied.

■ The next question is whether proceedings here should be suspended to permit the plaintiffs to return, at this time, to the AEC to pursue and complete the administrative remedy which they sought but were not allowed. The defendant seeks that disposition if we do not dismiss the cause of action entirely. The contractors urge that the Government is estopped from asking that we take that course, and we so hold. We think that the Government, because of the firm and clear position taken at the administrative level by its representative, should be estopped from saying that the controversy arises "under the contract" and that plaintiffs must now pursue their administrative remedy. Because of the special circumstances, the claim should be treated as for a "breach"—the way the parties characterized it at the administrative stage—even though that is not an accurate representation.

8. The Government does not contend that the plaintiffs are barred by their failure to seek Commission review of the hearing examiner's jurisdictional decision. The then current AEC regulation provided that a "party may seek an appeal" to the Commission itself and gave the Commission discretion as to "whether it will grant the appeal." As to future proceedings, the issue of whether appeal to the Commission is a necessary prerequi-

site to court action appears to be moot. The AEC has established a Board of Contract Appeals (10 C.F.R. Part 3 (1968)). The Board is the "authorized representative of the Commission for the purpose of considering and deciding appeals from findings of fact or decisions of contracting officers", and its decisions "are final decisions of the Commission." 10 C.F.R. § 3.3(a) (1968).

A contractor, of course, is not free to lead an administrative official astray on the scope of his authority. But the Government must also shoulder its responsibility as an advocate of the proper utilization of the "disputes" mechanism since a change of position when it reaches court may create a trap for an unsuspecting contractor.[9] We do not at all suggest that the Government planned it this way. Quite to the contrary, it is obvious that the Commission attorney who advised the manager and appeared at the hearing was as mistaken as were the plaintiffs. Even so, we cannot allow the Government to have it both ways.

The Government is not faced with the potential dilemma of a contractor who administratively presents his claim to protect his position even though he would prefer, and thinks he is entitled to, a judicial remedy. If he does not vigorously defend the applicability of the "disputes" clause, the Government, as in this case, would have us hold that he failed to exhaust his administrative remedies. If he argues too hard for administrative jurisdiction, he is likely to be faced with an estoppel argument. See note 9 supra. The Government will not be placed in such a quandary.

 If the Government believes that a dispute (or class of disputes) is subject to administrative resolution and that its best interest lies in following that route, the argument should be made at the administrative level. Had the Government's "wealth of authority"—now properly urged for saying that the dispute was "under the contract"—been cited to the hearing examiner or the contracting officer, the merits of the present case probably would long since have been determined and in the very forum the Government now contends is proper. Instead, its counsel at the AEC successfully pushed for administrative dismissal, indicating that the claim was for a "breach", and its counsel here now requests a judicial dismissal or suspension. This change-of-position has resulted in delay and should not be permitted.[10] The delay has prejudiced both the plaintiffs and the adjudicatory process. Since the use of the "disputes" mechanism can be waived (see, e.g., WRB Corp. v. United States, 177 Ct.Cl. 909, 914–915 (1966); Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. —— (April 1968)), as can the bar to a judicial trial of issues arising "under the contract" (Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 862–863, 162 Ct.Cl. 802, 806–808 (1963); WPC Enterprises Inc. v. United States, 323 F.2d 874, 878, 163 Ct.Cl. 1, 8, (1963), and similar rulings), we see no sufficient reason why estoppel cannot be used against the defendant in circumstances such as we have here.[11]

---

9. On the other hand, plaintiffs' presentation of their claim to the contracting officer and the hearing examiner provides no basis, at least in the circumstances here, for concluding that they are now estopped from arguing that their claim is for a breach. Compare Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 571, 174 Ct.Cl. 153, 180–181 (1966), and Universal Ecsco Corp. v. United States, 345 F.2d 586, 588–589, 170 Ct.Cl. 809, 813 (1965), with Banks Constr. Co. v. United States, 364 F.2d 357, 364–365, 176 Ct.Cl. 1302, 1312–1314 (1966) (alternative holding), and H. R. Henderson & Co. v. United States, 169 Ct.Cl. 228, 245 (1965). The defendant does not contend otherwise.

10. We deal only with the case in which the Government affirmatively urges lack of jurisdiction on the administrative tribunal, not with the case in which the tribunal decides *sua sponte* that it has no jurisdiction. Also, we do not have here a case in which the law was uncertain when the case was in its administrative stages but was clarified by the time it came to court. Cf. Robertson Electric Co. v. United States, 176 Ct.Cl. 1287, 1301–1302 (1966). The law here was very clear when this case was before the AEC but was simply not found or was misapplied.

11. Though we hinted in Laburnum Const. Corp. v. United States, 325 F.2d 451, 457 n. 5, 163 Ct.Cl. 339, 348 n. 5 (1963), that the Government might be held to the position it takes at the administrative level, the issue, to our knowledge, has never been directly raised in this court.

Cf. Pacific Far East Line Inc. v. United States, 394 F.2d 989, 184 Ct.Cl. —— (May 1968); Roberts v. United States, 357 F.2d 938, 946–947, 174 Ct.Cl. 940, 952–953 (1966). The defendant could waive the contractual requirement that this dispute be handled under the "disputes" procedure. We simply hold that by its conduct the defendant must be treated as having voluntarily waived this right and therefore as estopped to assert it now. Accordingly, the termination cause of action should be dealt with as a "breach" claim not arising "under" the contract.

Defendant's motion for partial summary judgment is denied and the case is remanded to the trial commissioner for further proceedings.

---

That we may have suspended proceedings in cases in which the doctrine of estoppel would have applied, if the plaintiff had argued it, is "not a proper precedent for similar action here" when the issue is raised. Len Co. and Associates v. United States, 385 F.2d 438, 447, 181 Ct.Cl. —— (1967). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not

to be considered as having been so decided as to constitute precedents." Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925).