**UNIVERSAL FIBERGLASS CORPORATION et al.,**

v.

**The UNITED STATES.**

**No. 285–68.**

United States Court of Claims.

June 16, 1976.

Robert D. Witte, Bronxville, N. Y., atty. of record for plaintiff. Alan M. Lestz, and Witte & Witte, Bronxville, N. Y., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before SKELTON, NICHOLS and KASHIWA, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request, filed August 8, 1975, and defendant's request, filed August 15, 1975, for review by the court of the recommended decision of Trial Judge C. Murray Bernhardt, filed April 8, 1975, pursuant to Rule 166(c), and on plaintiff's motion and defendant's cross motion for summary judgment. The case has been submitted to the court on the briefs and oral argument. Upon consideration thereof, since the court agrees with the main part of the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. However, we do not agree with the trial judge's recommended disposition of the counterclaims and therefore we do not adopt that portion of his recommended decision. As we held in the companion case of *Universal Fiberglass Corporation v. United States*, Ct.Cl., 537 F.2d 393, No. 85–70, decided today, the proceedings in this court are stayed for six months and we remand the counterclaims to the General Services Administration, such officers or agencies as may be appropriate, pursuant to Pub.L. 92–415, 86 Stat. 652 and the court's Rule 149(b), to determine the merits of defendant's counterclaims.

It is therefore concluded that plaintiff is not entitled to recover and plaintiff's motion for summary judgment is denied; defendant's cross motion for summary judgment is granted; defendant's counterclaims are remanded to the General Services Administration, such officers or agencies as may be appropriate. The dismissal of plaintiff's petition will await final action on defendant's counterclaims.

The opinion of the trial judge, as modified, follows:

## OPINION

BERNHARDT, Trial Judge:

By virtue of a court order of consolidation of March 19, 1973, this case is companion to *Universal Fiberglass Corp. v. United States*, Ct.Cl., 537 F.2d 393, No. 85–70, in which the court sustains, on a Wunderlich Act review proceeding, 41 U.S.C. §§ 321–22, a decision of the General Services Administration Board of Contract Appeals confirming default termination of a GSA contract for small vehicles ("mailsters") designed for Post Office use. The gravamina of the two cases, however, proved too dissimilar to commend a combined opinion embracing both petitions without producing confusion; the same pod, but different peas. The instant claim, while deriving from a subcontract under the terminated prime contract, involves a termination for convenience contention that the subcontractor, Dana Corporation, as use plaintiff, says is not stilled by the default termination of the parent contract.

To place the present claim in factual perspective, a contract was awarded Universal Fiberglass Corporation (UFC) in January 1965 for 12,714 mailsters. In May and August 1965 UFC issued purchase orders to Dana for rear axles and differential frameworks. The purchase orders authorized UFC to terminate them at the buyer's option, limited UFC's resultant liability in the event of termination by excluding anticipated profit, and incorporated by reference section 8–706 of the Armed Services Procurement Regulations relating to convenience termination, although no such counterpart clause of the Federal Procurement Regulations appeared in the prime contract. On August 9, 1966, Amendment No. 4 was issued to the prime contract changing the specifications to include certain safety features in compliance with new Federal Safety Standards applicable to all vehicles produced after September 27, 1966. The changes included conversion of the vehicles from 3 wheels to 4, thereby obsoleting, *inter alia*, the rear axles and differential frameworks being supplied by Dana under its purchase orders.

Paragraph 5 of the amendment to the prime contract provided as follows:

The ceiling of 1156 dollars total price per vehicle in paragraph 4 above does not include costs relative to inventory made obsolete by this amendment *nor costs relative to subcontract cancellations necessitated by this amendment.* It is understood and agreed that the contracting officer shall have the right to prescribe the manner of disposition of inventory made obsolete or excess as a result of this amendment. It is further understood and agreed that all settlements with subcontractors necessitated as a result of this amendment shall be coordinated in advance with the Contracting Officer. Failure to reach agreement as to costs covered in this paragraph 5 shall be treated as a dispute under the "Disputes" article of this contract. [Emphasis supplied.]

Under the amendment UFC was to submit to the contracting officer by October 1, 1966, data supporting an equitable price adjustment for the changes, "exclusive of data with respect to inventory made obsolete by those changes and data with respect to subcontract cancellations necessitated by these changes."

On August 9, 1966, the date of the amendment, UFC terminated Dana's subcontracts for the then obsolete materials and requested it to submit a termination claim. Thereafter over a period of 12 months, commencing in October 1966, GSA was furnished by UFC in behalf of Dana, and by Dana individually, various data with respect to its termination costs, culminating in a claim submitted by Dana on October 25, 1967, in the amount of $142,332.12. The claim was denied by the contracting officer on April 29, 1968, on the grounds of lack of privity between Dana and the Government, lack of any agency relationship between UFC and the Government making the latter liable as a principal for the debts of its agent, and the "total failure of consideration" for any obligation of the Government to absorb obsolescence costs under the amendment. The contracting officer also stated that the Government had no interest

in the obsoleted materials, which Dana was invited to dispose of as it saw fit.

Since the quoted paragraph 5 of the amendment provided that failure to reach agreement as to such cost claims would be treated as a dispute under the Disputes article, on May 10, 1968, Dana appealed to the Board, which on August 29, 1968, on Dana's motion, dismissed the appeal "without prejudice to reinstatement thereof should the Court [of Claims] in which suit is filed determine that any matter or matters exist which require administrative action * * *." This suit followed, filed by UFC as trustee for the use and benefit of Dana, and by Dana individually. UFC had authorized Dana to sue in UFC's name for Dana's benefit and at the latter's expense.

In the meantime on December 2, 1966, the prime contract with UFC had been terminated for default, an action sustained by the Board and, on review, by the trial division of the court in its opinion of March 18, 1975.

On March 19, 1973, the court entered an order in the instant petition on the parties' cross-motions for summary judgment, which dismissed Dana from the case in its individual capacity as plaintiff because Dana had shown no express or implied contract between itself and the Government, nor had demonstrated that UFC was merely an agent of the Government in dealing with Dana. The order, however, did not dismiss the claim of Dana as use plaintiff, but directed that its claim be consolidated with the claim by UFC under the prime contract for determination. That is the present posture of the matter, with UFC's claim under the prime contract having been recommended for dismissal by the trial division opinion in Court of Claims Case No. 85–70, and the termination claim of Dana under its subcontract being the sole outstanding issue in Court of Claims Case No. 285–68. The present issues are purely legal, as to which the Board decision properly stated its jurisdiction to be only permissive under the Wunderlich Act.

As pruned by the court's order of March 19, 1973, Dana's residual surviving contentions are that the amendment to the prime contract causing cancellation of the subcontracts in suit constituted a constructive partial termination in the guise of a change order; that Dana's rights to termination costs vested at the moment of subcontract termination brought about by the amendment to the prime contract; that the subsequent default termination of the prime contract did not affect Dana's vested rights in its claim for the convenience termination of the subcontracts; that Dana's convenience termination claim is not subject to offset of debts by UFC to the Government; that UFC is merely a trustee or fiduciary for Dana's recovery of its convenience termination costs with no pecuniary interest in the recovery; and that under the applicable section 1–8.701(b)(4) of the Federal Procurement Regulations (FPR) the Government had the option to settle directly with Dana for its convenience termination claim independent of UFC as trustee. The defense is in general denial of these contentions.

■ At the outset it seems clear that the amendment to the prime contract, which so profoundly changed the basic specifications of the vehicle and occasioned the abrupt termination of Dana's subcontracts, amounted to a constructive partial termination of the prime contract and a total termination of Dana's subcontracts, all for the Government's convenience. That is the law in this court (*General Contracting and Constr. Co. v. United States*, 84 Ct.Cl. 570 (1937)), elsewhere in the Federal court system (*J. W. Bateson Co. v. United States*, 308 F.2d 510 (5th Cir. 1962)), and in the administrative sphere (*Nolan Bros., Inc.*, 58–2 BCA ¶ 1910). Substance prevails over form. Even in form the amendment to the prime contract dictated, in the absence of a standard FPR termination for convenience clause in the contract, a settlement procedure for the disposition of subcontractor inventory necessitated by the amendment. The amendment can only be read as a *sub silentio* incorporation by reference of 41 C.F.R., Part 1–8 (Rev. January 1, 1967), the Federal Procurement Regulations relating to termination of contracts.

41 U.S.C. ch. 2 provides for the termination of war contracts. Section 107(d) authorizes the contracting agency to "settle directly termination claims of subcontractors to the extent that it deems such action necessary or desirable for the expeditious and equitable settlement of such claims." Further:

> * * * Any contracting agency undertaking to settle the termination claim of any subcontractor shall deliver to the subcontractor and the war contractor liable to him written notice stating its acceptance of responsibility for settling his claim and the conditions applicable thereto, which may include the release, or assignment to the contracting agency, of his claim against the war contractor liable to him; upon consent thereto by the subcontractor, the Government shall become liable for the settlement of his claims upon the conditions specified in the notice.

The liability of the defendant to the use plaintiff Dana depends in this case on the quoted section. While the GSA entertained Dana's subcontract termination claim it did not accept responsibility for settling it, but rather rejected the claim largely on the grounds of lack of privity. Failure of the agency to assume responsibility for subcontract claims presented under this section caused the dismissal of petitions in *Somerset Machine & Tool Co. v. United States,* 144 Ct.Cl. 481, *cert. denied* 361 U.S. 825, 80 S.Ct. 73, 4 L.Ed.2d 69 (1959), and in *Kal Machine Works, Inc. v. United States,* 68 F.Supp. 436, 107 Ct.Cl. 202 (1946). To similar effect see *Precision Metal & Machine Co. v. United States,* 68 F.Supp. 437, 107 Ct.Cl. 219 (1946), and *General Elevator Co. v. United States,* 122 Ct.Cl. 467 (1952). CCH, Government Contracts Reporter, ¶ 12,130, states: "A subcontractor has no contractual rights against the government and must seek settlement of his termination claims against the prime contractor * * with whom he contracted upon termination of the subcontract by the prime contractor * * *."

■ Dana claims to have had a vested right in its subcontract termination claim at the moment the subcontract was terminated by UFC. On the contrary, Dana enjoyed no vested right in such claim unless and until the GSA assumed the obligation to pay it. Until that transpires Dana's claim is solely against its prime contractor UFC, whose obligation it is under the Contract Settlement Act to pay the claim and seek reimbursement from the contracting agency.

[4] The Federal Procurement Regulations, 41 C.F.R., rev. January 1967, make this clear. FPR § 1–8.701 suggests the form of a termination for convenience clause applicable to fixed-price contracts. It imposes on the prime contractor of a contract terminated for convenience of the Government the obligation to terminate subcontracts (para. (b)(3)), assign its right, title and interest under the terminated subcontracts to the Government so that the latter may thereafter, in its discretion, settle or pay subcontractor termination claims directly (para. (b)(4)), settle subcontract termination claims subject to approval by the contracting officer (para. (b)(5)), etc. Except to the extent that the contracting agency elects to settle or pay subcontract termination claims directly, the claims arising from termination for convenience of a prime contract are to be paid to the prime contractor, and by him in turn paid to deserving subcontractors on their termination claims.

■ Dana, on the theory that its subcontract termination claim rights had vested, contends further that such rights are not subject to being offset by claims of the Government against UFC. If indeed a vesting of rights had occurred, or the defendant had elected to assume the obligation directly, then the defendant's counterclaims against UFC could not be set off. However, that not being the case, all claims arising from the termination for convenience of a prime contract, including subcontract termination claims, can be processed only through a settlement between the prime contractor and the contracting

officer or, failing agreement, then by the unilateral determination of the latter. In such case paras. (d) and (e) of FPR § 1–8.-701 limit recovery to the total contract price "as reduced by the amount of payments otherwise made and as further reduced by the contract price of work not terminated." Therefore, any Government counterclaims against UFC which exceed the termination for convenience conversion which UFC unsuccessfully sought in its claim under the prime contract would extinguish the termination for convenience claim of the prime contract as well as all subcontract termination claims ancillary thereto.

The Contract Settlement Act and its attendant regulations subserve the basic principle in Government contract law that there is no privity of contract between subcontractors and the Government, and the prime contractor is responsible to the subcontractors, who must look to the prime as their avenue of relief. This principle is so deeply engraved in case authority as to require no citation.